IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTRYWIDE HOME LOANS, INC.  )<br>a New York Corporation,                      )<br>                                                        )<br>                          **Plaintiff**,              )<br>          v.                                            )<br>                                                        )<br>UNITED STATES OF AMERICA,       )<br>acting through the Internal Revenue  )<br>Service; LA JOLLA GROUP II, an       )<br>entity form unknown; TERRANCE   )<br>FRAZIER, individually and dba La Jolla )<br>Group II; NEVADA TRUST DEED       )<br>SERVICES INC., a Nevada Corporation; )<br>LA SALLE NATIONAL BANK, as        )<br>TRUSTEE FOR AVONDALE HOME    )<br>EQUITY LOAN TRUST 1998-1, an       )<br>entity form unknown; ROBERT G.     )<br>GONZALES, an individual; MARISELA )<br>GONZALES, an individual; ALL          )<br>PERSONS KNOWN AND UNKNOWN  )<br>CLAIMING A RIGHT, TITLE OR          )<br>INTEREST IN OR TO THE REAL          )<br>PROPERTY COMMONLY KNOWN      )<br>AS 765 EAST WOODHAVEN LANE,     )<br>FRESNO, CALIFORNIA,                      )<br>                                                        )<br>                          **Defendants.**            )<br>_____ )<br>                                                        )<br>**and related cross and counter claims.**  )<br>                                                        ) | **CV F 02  6405 AWI SMS**<br><br>**FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW** |

**FINDINGS OF FACT**

1.     The real property, which is the subject of this action, is generally described as 765 E.

Woodhaven Lane, Fresno, California, and is legally described as Lot 14 of Tract No.

3374, Mount Vernon Place No. 1, in the City of Fresno, County of Fresno, State of

California, according to the Map recorded August 24, 1984, in Book 41 at Pages 97 to

100 Inclusive, of Maps, Fresno County Records (the "Property").   The Property was owned by Robert Gonzales and Marisela Gonzales, husband and wife, as joint tenants.

2.   A deed of trust executed by Robert G. Gonzales and Marisela Gonzales (the "Gonzaleses") as trustors in favor of Victoria Mortgage Company as beneficiary was recorded February 9, 1994 as Document No. 94021990 in Official Records of the Fresno County Recorder, encumbering the Property (the "CHL Deed of Trust"). (Trial Exhibit, hereafter "Ex." No. 1).

3.   The beneficial interest under the CHL Deed of Trust was assigned to Countrywide Home Loans Inc. ("Countrywide") by an Assignment recorded on July 14, 1994 as Document No. 94112148 and thereafter Countrywide became the servicer of the loan. (Ex. No. 2).

4.   When the CHL Deed of Trust was assigned to Countrywide, CTC Real Estate Services, Inc. ("CTC"), formerly known as CTC Foreclosure Services and as Countrywide Title Corporation.   CTC became the trustee under the CHL Deed of Trust.

5.   On February 25, 1998, a deed of trust executed by the Gonzaleses as trustors in favor of Avondale Federal Savings Bank in the amount of $18,900.00 was recorded as Document No. 98026346 (the "La Salle Trust Deed") encumbering the Property. (Ex. No. 13). Defendant La Salle National Bank, Trustee, is the successor in interest to Avondale, and this obligation is hereafter referred to as the "La Salle Loan."

6.   On November 23, 1998, the United States made federal income tax assessments against Robert Gonzales for the calendar year 1997 in the amounts of $3,085 in tax, $269.40 in penalties and $128.88 in interest. On May 31, 1999, the United States made federal income tax assessments against Robert Gonzales for the calendar year 1998 in the amounts of $7,680 in tax, $231.80 in penalties and $77.81 in interest. On May 29, 2000, the United States made federal income tax assessments against Robert Gonzales for the calendar year 1999 in the amounts of $8,278 in tax, $479.78 in penalties and $90.04 in interest.

7.  On August 18, 2000, the United States filed a Notice of Federal Tax Lien with the Fresno County Recorder's Office with respect to the income tax assessments against Robert Gonzales for the years 1997, 1998 and 1999.  The Notice of Federal Tax Lien was recorded as Document No. 2000-0099536. (Ex. No. 16).

8.  After the Gonzaleses defaulted under the CHL Loan, CTC caused a Notice of Default and Election to Sell Under Deed of Trust to be recorded on April 9, 2001, as Document No. 2001-0047487("CHL NOD I"). (Ex. No. 3).

9.  After expiration of the statutory three-month period, CTC caused a Notice of Trustee's Sale to be recorded on July 13, 2001, as Document No. 2001-0097583 ("CHL NOS I"). Ex. No. 4.

10. The Gonzaleses then cured the default under the CHL Loan.

11. On July 30, 2001, CTC employee, Angelica Del Toro, made an entry in the CTC foreclosure file concerning the pending foreclosure of the CHL deed of trust as follows: "Cancelled order on this date due to full payoff".  (Ex. No. 58)    This entry generated the preparation of a full reconveyance.

12. On August 3, 2001, CTC recorded a Full Reconveyance of the CHL Deed of Trust as Document No. 2001-0047487.  (Ex. No. 5).   This recording was a mistake and only the CHL NOD I should have been rescinded.

13. After default under the La Salle Loan, non-judicial foreclosure under the La Salle Trust Deed was initiated when Nevada Trust Deed Services, Inc. ("Nevada Trust") caused a Notice of Default and Election to Sale Under Deed of Trust to be recorded on November 21, 2001, as Document 01-0171086.   (Ex. No. 14).   The trustee's sale guarantee that Nevada Trust obtained when commencing its foreclosure in November 2001 did not show the Countrywide Deed of Trust because it had been reconveyed in August 2001.

14. The Gonzaleses made the August and September 2001 payments on the CHL Loan. However, the CHL Loan again went into default.    On January 4, 2002, CTC caused a

3

Notice of Default and Election to Sell Under the CHL Deed of Trust to be recorded as Document No. 2002-0001952 (the "CHL NOD II").   (Ex. No. 6).   This Notice does not reveal that the deed of trust had been reconveyed.    The trustee' sale guarantee issued by CTC as party of the January 4, 2002 CHL NOD II should have shown that the Countrywide Deed of Trust had been previously reconveyed.    CTC did not realize it had erroneously reconveyed the Countrywide Deed of Trust until October 2002.

15.   After expiration of the statutory three-month period for the default on the LaSalle Loan, Nevada Trust caused a Notice of Trustee's Sale to be recorded in February, 2002, as Document No. 2002-0031880 .   This Notice of Trustee's Sale initially scheduled a trustee's sale date of March 15, 2002. (Ex. No. 15).

16.   One of the parties entitled to receive notice of the foreclosure sale was the Internal Revenue Service ("IRS"), which had recorded a Notice of Federal Tax Lien against the Gonzaleses on August 18, 2000.

17.   On February 20, 2002, Nevada Trust first provided the IRS with written notice of the pending sale of the Property pursuant to the LaSalle Loan. By certified mail, return receipt requested, on February 20, 2002, Nevada Trust sent a copy of the Notice of Trustee's Sale to the IRS addressed to 5104 N. Blythe Street, Suite 102 (Stop FR 5530), Fresno, California 93722.   Based upon the delivery information contained on the return receipt, the IRS received the Notice of Trustee's Sale on February 25, 2002.

18.   The notice provided on February 20, 2002, was the only written notice provided by Nevada Trust to the IRS with respect to the trustee's sale of the Property.   Nevada Trust mailed notice of its trustee sale, along with appropriate documents, to the IRS in an untimely fashion. The IRS received only 23 day notice of the Nevada Trust foreclosure sale.   Nevada Trust did not realize that it did not properly give notice to the IRS until after the foreclosure sale had taken place.

19.   On March 15, 2002, Robert G. Gonzales filed a petition in the United States Bankruptcy

4

Court, Eastern District of California (Fresno), Case No. 02-12384. The filing of the bankruptcy caused the Countrywide and the La Salle foreclosure sales to be postponed. Case No. 02-12384 was dismissed on April 25, 2002. (Ex. No. 7).

20. Robert G. Gonzales filed a second petition on April 26, 2002 in the United States Bankruptcy Court, Eastern District of California ( Fresno), Case No. 02-13889.

21. Countrywide filed a motion for relief from the automatic stay and obtained relief from the Automatic Stay in Case No. 02-13889. Case No. 02-13889 was dismissed on August 1, 2002.   (Ex. No. 8).

22. The trustee's sale under the La Salle Trust Deed was conducted on August 15, 2002.

23. Alan Boyajian personally attended the sale on behalf of La Jolla Group II ("LJG II"). Terrance Frazier also personally attended the sale.   Because he had arrived late, Boyajian and Frazier did not discuss the Property.   Boyajian and Frazier (collectively "LJG II and Frazier") agreed on the day of the foreclosure sale to purchase the Property together.

24. Boyajian has access on his computer to information from title companies regarding comparable sales information, which he uses in forming opinions of the value of property he is thinking of purchasing at foreclosure sales.

25. Boyajian based his decision to bid at the foreclosure sale upon his estimate of the value of the Property, which was $235,000.   In his experience, Boyajian expected the bidding to go up to $120,000 to $130,000.   Expert witness Barbara Radcliffe estimated the value of the Property at $260,000 on August 15, 2002 and $415,000 as of April 26, 2007.

26. When Boyajian noticed that the Property was scheduled for sale, Boyajian recalled that the prior deed of trust on this property had been reconveyed.   As a result, at the time of the sale Boyajian believed that he was bidding on a first deed of trust.

27.  LJG II and Frazier submitted the successful bid of $24,200.00. (Ex. No. 17).  Boyajian was "ecstatic" when LJG II acquired title to the Property for $24,200.00.   Boyajian believed that he and Frazier had made a very favorable purchase of a property that was

1   unencumbered by any senior deeds of trust.

2   28.   The Trustee's Deed Upon Sale for the trustee's sale conducted by Nevada Trust on

3   August 15, 2002, was recorded on August 27, 2002 as Document No. 02-145898. (Ex.

4   No. 17).

5   29.   The Trustees Deed Upon Sale issued in favor of LJG II and Frazier contained the

6   statutory recitals provided for in California Civil Code § 2924.

7   30.   After expiration of the statutory three-month period and receiving relief from Robert

8   Gonzales' Automatic Stay in Bankruptcy Case No. 02-13889, CTC caused a second

9   Notice of Trustee's Sale to be recorded on September 3, 2002 as Document No.

10   2002-0150872, setting a trustee's sale date of September 19, 2002 ("CHL NOS II").

11   31.   On or about August 30, 2002, LJG II and Fraizer learned that Countrywide had noticed a

12   foreclosure sale on the Property for September 19, 2002.

13   32.   Unaware that the Countrywide Deed of Trust had been reconveyed, Frazier authorized

14   sending Countrywide $22,721.22 to reinstate the default and prevent the sale from going

15   forward on September 19, 2002.   When Boyajian learned that this payment had been

16   made, he notified Frazier about the reconveyance and contacted Countrywide to obtain

17   the return of funds.

18   33.   On September 24, 2002, Countrywide instructed CTC to rescind the CHL NOD II and

19   CTC rescinded CHL NOD II as Document No. 2002-0166168.

20   34.   In 2002, it was not CTC's custom and practice to examine the chain of title to determine

21   whether there had been prior foreclosures under the same deed of trust before processing

22   a new foreclosure. The Trustee Sale Guarantee obtained by CTC for CHL NOD II did not

23   contain a reference to the Full Reconveyance.   Landsafe Title Company, who prepared

24   this Trustee Sale Guarantee, failed to provide this information to CTC.   Landsafe is not

25   part of First American Title who provided the Trustee Sale Guarangeefor CHL NOD I.

26   CTC therefore did not discover the error with the Full Reconveyance until October 2002.

27

28                                          6

35.     On October 15, 2002, CTC recorded a document entitled Notice of Void Reconveyance as Document No. 2002-08142.

36.     In November 2003, Countrywide offered to return and refund the amount of LJG II's foreclosure bid, plus interest.

37.     On or about March 19, 2004 Countrywide, CTC, Nevada Trust, and La Salle entered into a written settlement that had been reached in November 2003. As part of the settlement La Salle authorized Nevada Trust to rescind the Trustees Deed Upon Sale in favor of LJG II and Frazier and assigned the La Salle Note and the La Salle Trust Deed to Countrywide. (Ex. No. 18).

38.     On or about June 24, 2004, Nevada Trust caused a "Notice of Rescission of Trustee's Deed Upon Sale" to be recorded as Document No. 04-138117.  (Ex No. 11).

39.     LJG II is a general partnership consisting of Alan Boyajian and Lee Kleim.   LJG II has been in the primary business of buying, selling, and leasing residential foreclosure properties since 1987.   Boyajian has been in the residential foreclosure business since 1974.

40.     Boyajian and Frazier frequently bought properties at foreclosure sales together, Boyajian and Frazier rarely bided against each other, and 95% of the time Boyajian and Frazier bid as partners.  If both Boyajian and Frazier showed up at the same sale, their understanding was that each party was acquiring a 50% interest in the property unless someone told the other he was not interested in the property.

41.     Both Boyajian and Frazier were experienced and sophisticated "professional bidders." Boyajian has purchased hundreds of properties at foreclosure sales.   Frazier started helping his guardian, Michael Thaler, in the foreclosure sale business when he was 13 years of age. Frazier started buying property on his own in 1995.

42.     LJG II has a process it uses to locate properties being offered at foreclosure sales.   Office staff clip and post notices of sales, which are organized by date.    Because of the large

1   volume of such notices, Boyajian generally only reviews the notices within a week to

2   several days prior to the scheduled sale.

3  43.  Most foreclosure sales are cancelled or postponed.

4  44.  It was not Boyajian's business practice to obtain preliminary reports from a title insurer.

5   Under the circumstances this process takes too long and is too costly.   Neither Boyajian

6   nor Frazier obtained a preliminary title report, guarantee or commitment from a title

7   company concerning a property prior to bidding at the foreclosure sale.   Neither Boyajian

8   nor Frazier pay for the information they receive regarding properties.

9  45.  In 2002, Boyajian's usual practice to obtain information on property was to contact a

10   customer service at a title company to obtain information about open deeds of trust and

11   encumbrances.   If a sale is postponed, a new research is done.

12  46.  Boyajian focuses his research on the position of the deed of trust they are buying and

13   whether there are any open deed of trust against the property.   Neither Boyajian nor

14   Frazier look into whether there are judgment liens on a property, tax liens, or other liens.

15   These are risk they take into account in their business.

16  47.  Concerning LJG II's practices on this purchase, Boyajian looked at the information he

17   had on the property in his file and did not see any open deeds of trust.

18        47.a.  Boyajian's investigation of the state of title to the Property first consisted of

19            requesting from First American Title Company copies of "open" trust deeds, i.e.,

20            trust deeds which had not been reconveyed.

21        47.b.  Second, Boyajian contacted Sandi Jenkins, a customer service representative at

22            First American Title, in order to obtain more information on the Property.   In his

23            initial conversation with Jenkins, she told Boyajian that the LaSalle Deed of Trust

24            was going to sale as a first deed of trust.   Boyajian responded that he though there

25            would be another deed of trust ahead of the LaSalle Deed of Trust.    Jenkins

26            responded that there had been, but it was paid off.   Boyajian asked Jenkins to

27

28                                        8

send him all information about the Property.

47.c.  On April 29, 2002, Boyajian received a 15 page fax from Jenkins.   The documents included the CHL Deed of Trust and a January 4, 2002 notice of default.

47.d.  Because the original fax did not include a copy of a recorded reconveyance on the CHL Deed of Trust, on May 2, 2002, Jenkins faxed this document.

48.  In reviewing the documents, Boyajian determined that a notice of default had been recorded on the CHL Deed of Trust after the full reconveyance.   Boyajian knew there was an inconsistency between the Full Reconveyance and the CHL NOD II.   Boyajian knew that a mistake had been made by Countrywide at the time that he bid at the Nevada Trust foreclosure sale on August 15, 2002 because Countrywide had filed a notice of reconveyance and then a notice of default.

49.  Because the Countrywide deed of trust had been reconveyed, Boyajian decided that the CHL NOD II had been recorded in error.   Boyajian's conclusion – that the CHL NOD II was the error –  was not unreasonable.

50.  Boyajian did not attempt to contact Countrywide, CTC, or Nevada Trust concerning the full reconveyance or CHL NOD II because he believed loan information is not normally given to third party caller regarding a loan.

51.  Countrywide and CTC provide limited public information to prospective bidders, such as whether a sale was going to proceed.  Had Boyajian called Countrywide and/or CTC and asked about the CHL NOD II, he would have been told CTC intended to proceed with a foreclosure sale.

52.  Carroll Gagnier, the President of Nevada Trust, reached the conclusion that the CHL Deed of Trust was a valid lien and the full reconveyance must have been done in error.

52.a  Gagnier formed the opinion that the CHL Deed of Trust had been reconveyed in error because of the timing of the documents and his conclusion that a person who

pays off a $180,000 obligation does not lose his property over a $20,000 obligation a few months later.

52.b    In Gagnier's experience it is unlikely to see a full reconveyance for $180,000 without new financing.

52.c.    Gagnier did not contact CTC or Countrywide to ask whether the full reconveyance was in error.

52.d.    Gagnier reached his conclusion based on his position as one conducting the foreclosure sale and not from the prospective of a bidder.

53.    Normally, Gagnier provides no information to prospective bidders on the priority of the deed of trust being foreclosed on.

54.    However, in this case, Gagnier instructed his staff that all parties who contracted Nevada Trust inquiring about the La Salle sale were to be directed to him personally.   Gagnier told any parties who contacted Nevada Trust, including those who did not request lien priority information, that the CHL Deed of Trust still remained a valid lien against the Property, the LaSalle Trust Deed being foreclosed was a junior trust deed, and the CHL Deed of Trust would have to be satisfied by any bidder acquiring title to the Property.

55.    Gagnier never spoke to Boyajian or Fraizer concerning the sale.

56.    Gagnier believed that any interested bidder would have called prior to the sale.   As such, Gagnier did not have an announcement made at the August 15, 2002 sale that the CHL Deed of Trust was valid nor did he post any warnings about the sale.

57.    Had either Boyajian or Frazier called Nevada Trust to inquire about the foreclosure sale, either would have been told by Gagnier that the Full Reconveyance had been recorded by mistake, and that any successful bidder at the foreclosure sale would be required to satisfy the debt to Countrywide.

58.    No expert testimony was provided on what a sophisticated bidder in the community would believe or do if faced with a title that contained a notice of default on a deed of

1    trust that had already been reconveyed.

2    59.   Simply because Boyajian did not reach the same conclusion as Gagnier about which

3          recording – the full reconveyance or the CHL NOD II –  was in error, is insufficient to

4          establish that any reasonable investor would have reached the same conclusion as

5          Gagnier.

6    60.   In the industry it is more common for a notice of default to be recorded in error than a full

7          reconveyance.   In fact, it is very rare for a full reconveyance to be recorded in error.

8    61.   It was not unreasonable for Boyajian to assume that the Full Reconveyance was not a

9          mistake, and that the CHL Loan had been paid in full.

10   62.   Gagnier's statements to prospective bidders prior to the conduct of the sale might have

11         contributed to a lower sale price.   However, it is speculative to determine how many

12         prospective bidders Gagnier spoke to and/or if his statements had any impact on the price.

13   63.   Both Frazier and Boyajian had the practice of having their staffs make telephone calls to

14         the foreclosure trustee on the day before and the day of a scheduled sale to make sure the

15         sale was going to proceed.

16   64.   Boyajian's office phone records reveal that his office had called Nevada Trust several

17         times between February 2002 and August 2002.

18   65.   It is unclear if Nevada Trust told Boyajian's staff about the CHL Deed of Trust.

19   66.   Boyajian testified that he came to the foreclosure sale prepared to bid up to $120,000, and

20         that he was surprised when the bidding stopped at a lower amount.

21   67.   Boyajian's surprise at the low bidding and enthusiastic behavior is evidence confirming

22         Boyajian's belief that the CHL Deed of Trust had been reconveyed.

23   68.   It is possible that the reason the bidding stopped at$24,200 is that all other bidders were

24         aware that the La Salle Deed of Trust was not the senior lien on the Property.

25   69.   It is equally possible that the reason the bidding stopped at only $24,200 was because

26         Boyajian and Frazier were the only experienced bidders at the auction who were serious

27

28                                                    11

about obtaining the Property.

70.  Boyajian's and Frazier's inability to remember if they had a cell phone during 2002 and/or the cell phone numbers and their failure to produce cell phone records does not make Boyajian's or Frazier's testimony incredible on other respects.

71.  Lery Albert Kleim testified that the Property generated $59,586 in income from March 2003 to April 2006. The property also had income of $1600 per month from April 2006 to May 2007.

72.  LJG II and Frazier have not paid property taxes since acquiring the Property. Countrywide has paid $17,234.78 in real property taxes from 2001 to August 6, 2007

**CONCLUSIONS OF LAW**

1.  A deed of trust is a lien on real property.  Monterey S.P. Partnership v. W.L. Bangham, Inc., 49 Cal.3d 454, 460  (1989).   Reconveyance of a deed of trust transfers the security interest to the current owner of the property, and upon recording, the lien is extinguished. California Civ. Code §§ 2939, 2941(b)(1); First Fidelity Thrift & Loan Assn. v. Alliance Bank, 60 Cal.App.4th 1433, 1441  (1998).    CTC, acting as Countrywide's agent, recorded a reconveyance on August 3, 2001, extinguishing Countrywide's lien.

2.  A reconveyance recorded by a trustee by mistake can be set aside by a court of equity in the absence of a bona fide purchaser or encumbrancer.  Conlan v. Sullivan, 110 Cal. 624, 626-27 (1895); First Fidelity Thrift & Loan Ass'n v. Alliance Bank, 60 Cal. App. 4th 1433, 1441 (1998); Ankoanda v. Walker-Smith, 44 Cal. App. 4th 610, 615 (1996); First Nationwide Savings v. Perry, 11 Cal. App.4th 1657, 1669 (1992); Vilkin v. Sommer, 260 Cal.App. 2d 687, 694 (1968); Simmons v. Briggs, 69 Cal. App. 447, 448 (1924);  MILLER AND STARR CALIFORNIA REAL ESTATE § 10:116, Effect of an erroneous reconveyance (2006).

3.  If a trustee executes an unauthorized reconveyance and the trustee subsequently conveys

12

the property, a bona fide purchaser who does not have notice of the trustee's lack of authority receives title free and clear of the lien.  CALIFORNIA REAL ESTATE 2D DIGEST DEEDS OF TRUST § 22 Reconveyance (2006); see also  Firato v. Tuttle, 48 Cal.2d 136, 139  (1957); Triple A Management Co., Inc. v. Frisone, 69 Cal.App.4th 520, 530 (1999). Here, the reconveyance prepared and recorded by CTC was voidable because it was filed by mistake.  Because the reconveyance was recorded in error, Countrywide had an equitable lien on the Property.

4.   A bona fide purchaser for value is not subject to a prior equitable lien.  First Fidelity Thrift & Loan Assn. v. Alliance Bank, 60 Cal.App.4th 1433, 1442  (1998).

5.   A bona fide purchaser for value who acquires his or her interest in real property without knowledge or notice of another's prior rights or interest in the property takes the property free of such unknown interests.  Any purchaser of real property acquires the property subject to prior interests of which he or she has actual or constructive notice.   Stout v. Gill, 110 Cal.App. 445, 449  (1930); In re Marriage of Cloney,  91 Cal.App.4th 429, 437 (2001); Hochstein v. Romero, 219 Cal.App.3d 447, 451-52  (1990).

6.   California Civil Code § 2924 creates a conclusive presumption in favor of a bona fide purchaser who receives a trustee's deed that contains a recital that the trustee has fulfilled its statutory notice requirements. Melendrez v. D & I Investment, Inc., 127 Cal.App.4th 1238, 1250 (2005).  Section 2924 reads in relevant part:

> A recital in the deed executed pursuant to the power of sale of compliance with all requirements of law regarding the mailing of copies of notices or the publication of a copy of the notice of default or the personal delivery of the copy of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof shall constitute prima facie evidence of compliance with these requirements and conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value and without notice.

7.   At issue in this action is whether LJG II and Frazier were bona fide purchasers of the Property.   The parties agree that if LJG II and Frazier were bona fide purchasers who had

no actual or constructive notice of the mistake in recording the full reconveyance, they hold title to the Property clear of Countrywide's equitable interest in the Property. However, if they were not bona fide purchasers, Countrywide maintains an equitable interest in the Property.

8.   Whether a buyer is a bona fide purchaser is a question of fact.  Melendrez v. D & I Investment, Inc., 127 Cal.App.4th 1238, 1254 (2005); Asisten v. Underwood, 183 Cal.App.2d 304, 311 (1960).

9.   Because Countrywide claims an equitable interest rather than an interest based on legal title, it has the burden to establish that LJG II and Frazier were not bona fide purchases and were on notice of Countrywide's equitable lien or interest in the property.  See First Fidelity Thrift & Loan Assn. v. Alliance Bank, 60 Cal.App.4th 1433 1442; 5 Miller & Starr, CALIFORNIA REAL ESTATE, § 11:50.

10.   A bona fide purchaser is one who pays value for the property without notice of any adverse interest or of any irregularity in the sale proceedings.  Hochstein v. Romero, 219 Cal.App.3d 447, 451 (1990).   The elements of bona fide purchase are payment of value, in good faith, and without actual or constructive notice of another's rights.  Melendrez v. D & I Investment, Inc.,127 Cal.App.4th 1238, 1251 (2005); Gates Rubber Co. v. Ulman, 214 Cal.App.3d 356, 364 (1989).

11.   The second element requires the buyer have neither knowledge nor notice of the competing claim. Triple A Management Co. v. Frisone, 69 Cal.App.4th 520, 530  (1999). "A person generally has notice of a particular fact if that person has knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact." First Fidelity Thrift & Loan Assn., 60 Cal.App.4th 1433, 1443 (1998); see also California Civ. Code, § 19; 5 MILLER & STARR, CAL. REAL ESTATE, Recording and Priorities, §§ 11:49-11:51, 11:58-11:59.   The rationale for this requirement is that "[t]he recording laws were not enacted to protect those whose ignorance of the title is deliberate and intentional . . .

1   Their purpose is to protect those who honestly believe they are acquiring a good title, and

2   who invest some substantial sum in reliance on that belief." <u>Beach v. Faust</u>, 2 Cal.2d 290,

3   292-93  (1935); <u>Melendrez</u>, 127 Cal.App.4th at 1252.

4   12.   A bona fide purchaser or encumbrancer can rely on the public records and receives title

5   free and clear of the equitable lien if he or she does not have knowledge or notice that a

6   trustee was not authorized to make the reconveyance.  <u>Firato v. Tuttle</u>, 48 Cal. 2d 136

7   (1957); <u>March v. Pantaleo</u>, 4 Cal. 2d 242, 243-44 (1935); <u>First Fidelity Thrift & Loan</u>

8   <u>Ass'n v. Alliance Bank</u>, 60 Cal. App. 4th 1433, 1441-42 (1998); <u>Huckell v. Matranga</u>, 99

9   Cal. App. 3d 471, 478 (1979).

10   13.   Boyajian reasonably relied on the duly recorded reconveyance in this case.   This

11   reconveyance was properly filed, and had been filed for over a year without any

12   indication that it was a mistake.    The CW NOD II had been recorded after the

13   reconveyance, but it made no mention of the reconveyance.    Boyajian knew that a

14   mistake had been made because the CW NOD II was inconsistent with the full

15   reconveyance.   However, it would have been reasonable to conclude that if the CW NOD

16   II was proper, it would have addressed the reconveyance.  It also would have been

17   reasonable to conclude that while notices of default are recorded in error, full

18   reconveyances are almost never recorded in error.   As such, LJG II and Frazier could

19   properly rely on the title because nothing in the title put them on constructive notice that

20   the full reconveyance had been recorded in error.

21   14.   The duties on a purchaser to go beyond a title are minimal.   This case is similar to <u>First</u>

22   <u>Fidelity Thirt & Loan Asso'n v. Alliance Bank</u>, 60 Cal.App.4th 1433 (1998).

23   14.a.   In <u>First Fidelity</u>, the borrower obtained a loan from First Fidelity, which originally

24   encumbered the borrower's commercial property and also his home.   <u>Id</u>. at 1436.

25   The agreement provided that when a capital reduction payment was made, First

26   Fidelity would reconvey the encumbrance on the borrower's home.   When the

27

28   15

borrower made the capital reduction payment, First Fidelity mistakenly instructed the trustee to reconvey the commercial property, not the home, and the trustee recorded a reconveyance of the commercial property, not the home.   Id.   Four months later, when the borrower applied to Alliance for a loan, the borrower listed the commercial properly as an asset and noted an encumbrance against this property in favor of First Fidelity.   Id.   Before the Alliance loan was given, the borrower obtained a loan from a third bank, using the commercial property as collateral.   Id. at 1437.

14.b.   Prior to funding its loan, Alliance's loan officer reviewed title reports showing only the third bank's deed of trust and not First Fidelity's deed of trust on the commercial property.   Id. at 1437.   Noting the discrepancy between this statement and the borrower's loan application, the loan officer spoke to the borrower who told Alliance that he had "refinanced" and that one of his properties had been released.   The borrowor advised that his application was in error, and that the deed of trust in favor of First Fidelity encumbered only his home.   Id. The Alliance loan officer then phoned the third party bank, and it advised that the loan from First Fidelity against the commercial property had been repaid and First Fidelity held a deed of trust only against the borrower's home.   Id. at 1437-38. Alliance then funded its own loan, and secured it by a second deed of trust on the commercial property.

14.c.   Almost two years after Alliance funded its loan, First Fidelity discovered that it had mistakenly reconveyed its deed of trust against the commercial property.   Id. at 1439.   First Fidelity sued the borrower and obtained a judgment which reinstated First Fidelity's deed of trust against the commercial property as of the date on which First Fidelity had recorded its lis pendens.    This date was after the recording of Alliance's deed of trust, and thus First Fidelity's deed of trust against

1    the commercial property was junior in time to Alliance's deed of trust.  Id.

14.d.    The third party bank was paid, and when both Alliance's and First Fidelity's deeds of trust went into default both lenders instituted foreclosure proceedings.  Id.   A lawsuit between Alliance and First Fidelity resulted, with First Fidelity and Alliance both filing motions for summary judgment.  First Fidelity contended that Alliance was not a bona fide encumbrancer because Alliance had a duty to investigate the manner in which the encumbrance had been released, making First Fidelity's encumbrance senior.  Alliance contended that it had no actual notice of any outstanding interest held by First Fidelity and that it had no duty to investigate any more than it did.   Id. at 1440.  The trial court denied First Fidelity's motion and granted Alliance's motion, and First Fidelity appealed.  Id.

14.e.    The court of appeal first confirmed that a good faith encumbrancer takes title clear of unknown and unrecorded liens.  Id. at 1440-41.  The court of appeal found that First Fidelity's claim was an equitable claim to reinstatement of a previously extinguished lien.  First Fidelity, 60 Cal.App.4th at 1441.  The court of appeal concluded that Alliance presented evidence that it had no knowledge that First Fidelity had an equitable claim.  Id. at 1442.  When the burden shifted to First Fidelity to present evidence showing a triable issue of fact on whether Alliance did have constructive notice of First Fidelity's claim, First Fidelity attempted to meet this burden by presenting evidence of two facts: (1) That the borrower had initially listed a First Fidelity encumbrance against the commercial property, and (2) That Alliance had not telephoned First Fidelity to inquire.  Id.   On these facts, the court of appeal determined that Alliance had done all that was required because upon being advised of one encumbrance in favor of First Fidelity and obtaining a title report without such an encumbrance, Alliance was told that First Fidelity held an encumbrance only against the borrower's home.  Id.  at 1444.

17

"No evidence was presented to the effect that Alliance had reason to suspect that the unusual had occurred: that First Fidelity had reconveyed by mistake." Id. While it might have been a good business practice for Alliance to have done more, the court of appeal concluded that "there is no authority for the proposition that a prospective lender, learning that a prior deed of trust had been reconveyed, has a duty to investigate further to determine whether that reconveyance was in error." Id. 1444-45.   In making this finding, the court of appeal noted Alliance had not ignored the inconsistency. Id. at 1445.   Instead, Alliance had obtained further clarification from the borrower, spoke to the third party bank, and consulted a title report. Id.   The California Court of Appeal stated:

> The inquiry legally required . . . is only a reasonable inquiry, not an exhaustive one. Although this is a matter of degree, the duty to inquire here was discharged once the sole discrepancy had been explained in a manner consistent with normal practice.   As the Supreme Court stated in March, "[f]urther inquiries ... were not, under these circumstances, necessary."

Id. at 1445 (quoting March v. Pantaleo, 4 Cal.2d 242, 244 (1935)).

15.   Based on First Fidelity, LJG II and Frazier could rely on the Property's title and had no duty to investigate beyond the Property's record title.

16.   The title to the Property showed that the Countrywide loan had been discharged, and in general, there is no duty to investigate beyond the state of record title. First Fidelity, 60 Cal.App.4th at 1444-45.

17.   As in First Fidelity, LJG II and Frazier did not know about Countrywide's equitable claim.   Based on the evidence admitted at trial, LJG II and Frazier had insufficient information for the court to find that they had knowledge of Countrywide's equitable claim.

18.   While Boyajian was a sophisticated purchaser who knew that a mistake had been made regarding the Property's title, all evidence indicates that a mistaken full reconveyance,

18

1   unlike a mistake notice of default, is very rare.

2   19.   The amount Boyajian was willing to bid for the property and his response to his low

3       winning bid show that Boyajian did not believe Countrywide had an equitable interest in

4       the property.

5   20.   Other than Gagnier, no evidence was admitted that any other expert or sophisticated

6       bidder in the industry would have believed Countrywide maintained an interest in the

7       property.   The fact an employee of Nevada Trust came to a conclusion different than

8       Boyajian is insufficient evidence of Boyajian's knowledge of Countrywide's equitable

9       interest.

10  21.   The court recognizes that a subsequent purchaser or encumbrancer is charged with

11      constructive knowledge of what a reasonable investigation would have revealed.   Rutter,

12      CAL. PRACTICE GUIDE: REAL PROP. TRANSACTIONS CH. 6-H, H. Security For Promissory

13      Note (2006).   While a subsequent encumbrancer is permitted to rely only on the recorded

14      state of title as that state of title objectively presents itself, such a purchaser or

15      encumbrancer is not entitled to view the record either through rose-colored glasses or

16      with blinders on.  Triple A Management Co., Inc. v. Frisone, 69 Cal.App.4th 520, 530

17      (1999).   He is not entitled  to interpret ambiguities in his own favor by ignoring

18      reasonable warning signs that appear in the recorded documents or from information

19      obtained outside the chain of title.  Id. at 530-31.   Information that reasonably brings

20      into question the state of the title triggers a limited duty of inquiry.

21  22.   Given the evidence that full reconveyances are almost never recorded in error, Boyajian

22      did not ignore reasonable warning signs appearing in title.    In addition, Boyajian had no

23      information from an outside source that the reconveyance was in error.    All evidence

24      indicates that had Boyajian called Countrywide or CTC and asked if the full

25      reconveyance had been recorded in error, Boyajian would not have been given this

26      information.

27

28                              19

23. Under the facts of this case, the court finds that Boyajian's inquiry was reasonable and LJG II and Frazier were bona-fide purchasers.

24. The IRS was not given proper notice of the foreclosure sale.

25. Current California Civil Code § 2924b would require Nevada Trust to rescind the sale because the IRS was not given proper notice.   However, Section 2924b was not the law at the time the sale took place, and did not provide Nevada Trust with a basis to rescind the sale.  Unlike the current version of Section 2924b, the 2002 version only required notice to the IRS.

26. California Civil Code § 1058.5(b) allows a trustee to rescind a sale and reads in part: "Where a trustee's deed is invalidated by a pending bankruptcy or otherwise, recondition of a notice of rescission of the trustee's deed . . .[that]  names of all trustors and beneficiaries, the location of the property subject to the deed of trust, and the reason for rescission, shall restore the condition of record title to the real property described in the trustee's deed and the existence and priority of all lien holders to the status quo prior to the recondition of the trustee's deed upon sale."   Using Section 1058.5(b), a trustee may set aside or void a otherwise completed non-judicial foreclosure sale even after the trustee's deed is delivered to the high bidding purchaser under certain circumstances in the absence of an intervening bona fide purchaser.   RUTTER, CAL. PRACTICE GUIDE: REAL PROP. TRANSACTIONS Ch. 6-I, § 6:535.35.   Statutorily deficient notice of default and/or notice of the sale is grounds to set aside a sale.   The statutory requirements of Section 2924 must be strictly complied with, and a trustee's sale based on a statutorily deficient notice of default is invalid.  Miller v. Cote, 127 Cal.App.3d 888, 894 (1982).

27. California Civil Code § 2924 limits the trustee's ability to set aside a deed of trust for failures in notice if the trustee's deed complied with Section 2924.   A recital in the trustee's deed of compliance with "all requirements of law" regarding mailing or personal delivery and publication or posting of the copies of notice of default and notice of sale

20

"shall constitute prima facie evidence of compliance with these requirements and conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value and without notice."   California Civil Code § 2924.   Setting aside a trustee's sale for inadequate notice is not possible in the event of a bona fide purchaser who has the benefit of a conclusive presumption that the foreclosure sale was properly noticed.  Melendrez v. D & I Investment, Inc., (2005) 127 Cal. App. 4th 1238, 1255 (2005);  Bank of America, N.A. v. La Jolla Group II, 129 Cal.App.4th 706, 714  (2004);  Kolodge v. Boyd, 88 Cal.App.4th 349, 359  (2001).   Because the court finds LJG II and Fraizer were bona fide purchases, Nevada Trust had no common law ability to rescind the sale even if notice to the IRS was improper in light of Section 2924.

28.   As a general rule, the purchaser of property at a nonjudicial foreclosure sale receives title under a trustee's deed free and clear of any right, title, or interest of the trustor. Cal. Civ. Code § 2924g;  Melendrez v. D & I Investment, Inc., 127 Cal. App.4th 1238 (2005). However, an inadequate sale price coupled with a procedural irregularity may warrant a set-aside of a completed foreclosure sale just as it may be a basis for aborting a sale not yet completed.  Knapp v. Doherty, 123 Cal.App. 4th 76, 94–97 (2004).  "A non-judicial foreclosure sale is accompanied by a common law presumption that it 'was conducted regularly and fairly.'"  Melendrez,  127 Cal.App.4th at 1258 (quoting Brown v. Busch, 152 Cal.App.2d 200, 204 (1957)).   One attacking such a sale must overcome this common law presumption by substantial evidence of prejudicial procedural irregularity. Melendrez,  127 Cal.App.4th at 1258;  Knapp v. Doherty, 123 Cal.App.4th 76, 87 (2004). While mere inadequacy of price, standing alone, will not justify setting aside a trustee's sale, gross inadequacy of price coupled with even slight unfairness or irregularity is a sufficient basis for setting the sale aside."  Estate of Yates, 25 Cal.App.4th at 523; Whitman v. Transtate Title Co. 165 Cal.App.3d 312, 323 (1985);  Miller and Starr, CALIFORNIA REAL ESTATE 3d § 10:210 (2006).  "The inquiry is whether, recognizing the

purposes of the statutory scheme, there is a substantial defect in the statutory procedure that is prejudicial to the interests of the trustor and claimants."  Residential Capital v. Cal-Western Reconveyance Corp., 108 Cal.App.4th 807, 822 (2003).

29. Unlike notice errors, the statutory presumption in favor of a bona fide purchaser at non-judicial foreclosure sale found in Section 2924 pertains only to notice requirements for sale, and it does not apply to other requirements of the foreclosure process. CA JUR. 3D DEEDS OF TRUST § 318 Irregularities in conduct of sale; 4 MILLER & STARR, § 10:211, p. 680; see also Bank of America, N.A. v. La Jolla Group II, 129 Cal.App.4th at 714 (2005). For example, the Section 2924 recitals do not protect purchasers when the trustee violated its statutory obligation of postponing the sale upon agreement of the beneficiary and trustor.  Melendrez,  127 Cal.App.4th at 1255-56.

30. The presumption that nonjudicial foreclosure sale was conducted regularly and fairly may be rebutted only by substantial evidence of prejudicial procedural irregularity. Cal.Civ.Code § 2924.

31. Here, the court finds that LJG II and Frazier were bona fide purchasers for value even though they had experience in foreclosure sales and purchased the Property at below market value.

32. Gagnier's statements to some unknown number of persons that the CHL Deed of Trust remained on the Property is insufficient to find substantial evidence of prejudicial procedural irregularity in the sale.   There is no evidence as to how many persons Gagnier spoke to, whether Gagnier's comments impacted the bids, or whether but for Gagnier's statements, the Property would have sold for more.

33. Whether LJG II and Frazier's agreement to bid together on the Property forestalled competitive bidding and resulting in an inadequate purchase price is speculative.

34. The rescission of the trustee's deed issued in favor of LaJolla and Frazier was improper.

**CONCLUSION AND ORDER**

1.  LJG II and Frazier were bona fide purchasers at the August 15, 2002 sale.

2.  LJG II and Frazier took title to the Property free and clear of any equitable claim asserted by Countrywide.

3.  The foreclosure sale was conducted fairly and regularly and without substantial evidence of a prejudicial procedural irregularity.

4.  LJG II and Frazier are entitled to judgment quieting title to the Property against Countrywide and Gonzales.

5.  Pursuant to the agreement of the parties and the court's prior orders, LJG II's and Frazier's title is subject to the tax liens asserted by the United States for those amounts levied prior to August 15, 2002.

6.  Pursuant to the court's order on summary judgment, the court finds against LJG II and Frazier on any negligence claims.

7.  Countrywide SHALL return to LJG II and Fraizer the sum of $22,721.22 paid in order to prevent a foreclosure sale on the Countrywide Deed of Trust.

8.  Within fifteen days of this order's date of service, the parties shall submit either a proposed judgment, in conformance with this order, or a scheduling statement setting forth what remains of this action and the deadlines for any further filings.

IT IS SO ORDERED.

**Dated:   August 10, 2007**              _____/s/ Anthony W. Ishii_____
                                          UNITED STATES DISTRICT JUDGE